IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EDDIE LACY STIVERS III, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:18-CV-263-Y |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Eddie Lacy Stivers III, a state prisoner, against Lorie Davis, director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent. After having considered the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I.  Factual and Procedural History**

On January 30, 2014, a jury in Hood County, Texas, Case No. CR12356, found Petitioner guilty on one count of aggravated theft of property in the amount of $200,000 or more, one count of securities fraud in the amount of more than $100,000, and one count of securities fraud in the amount of $10,000 or more but less than $100,000 and assessed his punishment at 85 years' imprisonment for each of the first two offenses and 20 years' imprisonment for the

third offense. (SHR[1] 147-49, 155-57, doc. 13-26.) Petitioner appealed his convictions, but the Second District Court of Appeals of Texas affirmed the trial court's judgments and the Texas Court of Criminal Appeals refused his petition for discretionary review. (Id. at 195-223; Docket Sheet 2, doc. 12-2.) Petitioner also filed a post-conviction state habeas-corpus application challenging his convictions, which was denied by the Texas Court of Criminal Appeals without written order. (SHR 6-22, doc. 13-26; Action Taken, doc. 13-25.) This federal petition for habeas relief followed.

The state appellate court briefly summarized the facts of the case as follows:

> [Petitioner] received $519,375.51 from investors and lenders over a period of about five-and-a-half years. The investors thought they were investing in health insurance companies that [Petitioner] was trying to launch. [Petitioner] told investors that they could expect a tenfold return on their investment in five years or, in a worst-case scenario, he would return their investment in full with 10% or, in some instances, 12% interest. As for the lenders, they were generally under the impression that they were providing [Petitioner] a short-term bridge loan until other funds—currently unavailable for one reason or another—became available, and once they became available, those funds would be used to repay the loan.
>
> Neither the investors nor the lenders contemplated [Petitioner]'s using the money for his personal expenses. The evidence showed, however, that [Petitioner] spent over $400,000 of the money he received from investors and lenders on his personal expenses. Because most of the complainants went to the same church as [Petitioner] and knew [Petitioner] through his involvement in the church, the State referred to [Petitioner]'s conduct as an

---

[1] "SHR" refers to the court record in Petitioner's state habeas-corpus proceeding in WR-88,295-01.

affinity fraud.

(SHR 196, doc. 13-26.)

## II. Issues

Petitioner claims in two grounds that the trial judge erred and abused his discretion by failing to recuse himself sua sponte and by denying Petitioner's motion for continuance and that he received ineffective assistance of counsel at trial. (Pet. 6, doc. 1.)

## III. RULE 5 STATEMENT

Respondent does not allege that the petition is barred by successiveness, the statute of limitations, or a failure to exhaust state-court remedies. (Resp't's Answer 5, doc. 10.)

## IV. Legal Standard for Granting Federal Habeas Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter*, 562

U.S. 86, 100 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The Act also requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. This presumption of correctness applies to both express and implied findings of fact. *Valdez v. Cockrell,* 274 F.3d 941, 948 (5th Cir. 2001). Further, when the Texas Court of Criminal Appeals denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Singleton v. Johnson,* 178 F.3d 381, 384 (5thj Cir. 1999); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court may infer fact findings consistent with the state court's disposition and assume that the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Schartzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez,* 274 F.3d at 948 n.11; *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997). A petitioner has the burden of rebutting the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

## V. Discussion

### A. Due-Process Violations

Under his first ground, Petitioner claims that, in violation of his right to due process, the trial judge erred and abused his discretion by not recusing himself sua sponte and by denying his motion for continuance.[2] (Pet. 6, 11-13, doc. 1.[3])

To warrant federal habeas relief on a claim of state trial-court error, the error must do more than merely affect the verdict; the error must render the trial as a whole fundamentally unfair. *See Bailey v. Procunier,* 744 F.2d 1166, 1168 (5th Cir. 1984). In order to determine whether an error by the trial court rendered the trial fundamentally unfair, it must be determined if there is a reasonable probability that the verdict would have been different had the trial been conducted properly. *See Schrader v. Whiteley,* 904 F.2d 282, 288 (5th Cir. 1990); *Rogers v. Lynaugh,* 848 F.2d 606, 609 (5th Cir. 1988); *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278-79 (5th Cir. 1985).

---

[2]To the extent Petitioner claims his rights under the Texas Constitution were violated as a result of the judge's acts or omissions, he fails to state a claim cognizable on federal habeas review. *See Sharp v. Johnson,* 107 F.3d 282, 290 (5th Cir. 1997); *Pemberton v. Collins,* 991 F.2d 1218, 1223 (5th Cir. 1993).

[3]Because there are pages attached to the form petition, the pagination in the ECF header is used.

Petitioner claims that his right to due process was violated by the trial court's failure to recuse himself sua sponte because he attended the same church as Petitioner and most of the victims in his case. (Pet. 6, 11-12.) To secure habeas relief on the basis of a due-process-clause argument that the judge failed to recuse himself, a petitioner must establish that a genuine question exists concerning the judge's impartiality. *See Bigby v. Dretke,* 402 F.3d 551, 559 (5th Cir. 2005) (citing *Liteky v. United States,* 510 U.S. 540, 552 (1994)). There must be an appearance of impropriety which rises to the level of a fundamental defect resulting in a complete miscarriage of justice; absent that level of severity, habeas relief will not lie. Bias is not lightly established because ordinarily courts "presume that public officials have properly discharged their official duties." *See id.* (quoting *Bracy v. Gramley,* 520 U.S. 899, 909 (1997)).

Here, the record is devoid of any factual substantiation sufficient to establish any appearance of impropriety or demonstrate that the relationship between the judge and the complainants as members of the same church negatively impacted Petitioner's case. It is well established that absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro-se petition, unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value. *Ross v. Estelle,* 694 F.2d 1008,

1011 (5th Cir. 1983). Mere conclusory allegations do not raise a constitutional issue in a habeas proceeding. *Id.*

Petitioner also claims that his right to due process was violated by the trial court's denial of his motion for continuance. (Pet. 6, 11-13, doc. 1.) To secure habeas relief on the basis of a due-process-clause argument that the trial court failed to grant a continuance, a petitioner must establish that the denial was an abuse of discretion and that the denial was so arbitrary as to render the trial unfair. *See Schrader,* 904 F.2d at 288-89.

This claim was raised by Petitioner on direct appeal. Relying solely on state law, in the last reasoned opinion on the issue, the state appellate court addressed the claim as follows:

> [Petitioner] contends the trial court abused its discretion by denying his first motion for continuance requesting a thirty-day delay. [Petitioner] complains that his attorneys had only a week to prepare for trial and, further, argues a thirty-day delay was not unreasonable.
>
> The record shows the State filed its indictment against [Petitioner] on December 5, 2012, and that by December 13, 2012, [Petitioner] had retained counsel. By December 31, 2012, two new retained attorneys had substituted in for [Petitioner].
>
> The trial court's docket sheet shows that on March 18, 2013, the case was set number one for a jury trial on August 18, 2013. Although the record does not reveal why the trial court set the case number one on August 18, 2013, the indictment identifies thirty-seven different investors, presenting a sizeable logistical challenge. On July 10, 2013, the trial court approved an agreement between the State and [Petitioner] to reset the case to January 27, 2014. The docket sheet contains the notation, "Be ready."

Thereafter, on August 27, 2013, [Petitioner]'s two new attorneys filed a motion to withdraw. This was still five months from the January 27, 2014 trial date. On September 26, 2013, the trial court granted their motion to withdraw. Also on September 26, 2013, [Petitioner]'s first attorney filed a motion to substitute back in as counsel, and the trial court granted his motion. This was still four months before the January 27, 2014 trial date.

On December 10, 2013, [Petitioner]'s first attorney filed another motion to withdraw as counsel. On January 21, 2014, two new attorneys—the two who ultimately represented [Petitioner] at trial—filed a motion to substitute as counsel for [Petitioner] and a motion for continuance. The trial court granted the motion to substitute counsel on January 22, 2014—five days before trial.

On the morning of trial, January 27, 2014, the trial court denied [Petitioner]'s motion for continuance without hearing argument or evidence and signed a written order denying it. After the trial court's ruling, defense counsel put [Petitioner] on the stand, and [Petitioner] acknowledged approaching his most recently-retained counsel about a week earlier about substituting in, acknowledged his most recently-retained counsel had explained to him the difficulties of getting a case ready so close to trial, and, finally, acknowledged that he was not surprised that the trial court denied his motion for continuance. [Petitioner] also acknowledged that it was his understanding that his most recently retained counsel had devoted practically all their time to his case in the time they had.

[Petitioner] cites two [state] cases, *Ex parte Windham* and *Greene v. State*, for the proposition that a nine-part test applies to the denial of his motion for continuance. However, those are cases in which the denial of a motion for continuance resulted in the defendant having to proceed without the counsel of his choice. In *Windham,* when the defendant's retained attorney could not attend trial absent a continuance, the trial court's denial of the defendant's motion for continuance forced him to proceed to trial with his retained counsel's less-experienced partner. And in *Greene,* the defendant filed a motion to substitute counsel and a motion for continuance a week before trial in which the defendant's proposed new counsel admitted he could not be ready in

8

time for the trial set the following week. The trial court denied both the motion to substitute counsel and the motion for continuance, and the defendant was required to proceed with her previously-retained counsel. [Petitioner] is not in the same procedural posture as the defendants in *Windham* and *Greene*. Unlike those defendants, [Petitioner] proceeded to trial with the counsel of his choice. [Petitioner]'s reliance on *Windham* and *Greene* is, therefore, not persuasive.

Appellate courts review the denial of a motion for continuance for an abuse of discretion. To show that the denial of a motion for continuance rose to the level of an abuse of discretion, an [Petitioner] must show he was prejudiced by defense counsel's lack of preparation time.

In [Petitioner]'s brief, he concedes defense counsel did a decent job during the trial on guilt/innocence considering the time restraints under which they were forced to work. For harm, [Petitioner] focuses, instead, on his sentences and argues that the denial of his motion for continuance contributed to his punishments. [Petitioner] does not, however, explain how the denial of his motion for continuance contributed to his punishments. [Petitioner] does not show any specific prejudice linking the denial of his motion for continuance to the punishments he received, he does not allege unfair surprise, he does not lament an inability to effectively cross-examine any of the State's witnesses, and he does not show how any additional potential witness could have provided crucial testimony. "That counsel merely desired more time to prepare does not alone establish an abuse of discretion." We note that during the punishment trial, defense counsel called four witnesses on [Petitioner]'s behalf.

One of [Petitioner]'s witnesses had been a school teacher for forty-eight years. She and her husband were two of [Petitioner]'s recent investors who had invested "thousands and thousands of dollars" with him. She and her husband also contributed $18,000 to help pay for [Petitioner]'s legal defense of his criminal charges. Regarding the money contributed to [Petitioner]'s defense fund, she said, "That's how much faith we have in him." She added that they executed some promissory notes with [Petitioner] too. When asked if she was concerned about how [Petitioner] used the money, she answered, "I know in my heart of hearts [Petitioner] will pay us back when he

9

can."

She described a visit by two men from the State Securities Board as "one of the most devastating experiences [she had] ever had." Her husband had been bedridden for three-and-a-half weeks, had been critically ill, and had had several surgeries. The two men made demands and accusations, said derogatory things about [Petitioner], and said that she and her husband were victims of a crime. In spite of [Petitioner]'s convictions, she described [Petitioner] as "a hard-working, entrepreneur man, as my husband is, making the best way he can to make a living, start a business, as my husband did. He's a good father, he's an excellent husband. I think he's a fine Christian man." She did not think she was one of [Petitioner]'s victims. She said she and her husband still trusted [Petitioner].

D.H., another of [Petitioner]'s witnesses during the punishment phase of trial, testified that he was the minister of music at his church and that he started The Promise, which he described as an epic musical drama on the life of Christ. The Promise had been showing in Glen Rose for twenty-five years. He knew [Petitioner]. D.H. said the people of Granbury, the people at their church, and [Petitioner] helped pay for his liver transplant. [Petitioner] was the person who brought the money to him. Knowing [Petitioner], D.H. did not think society would benefit from his going to prison. D.H. trusted the court to effectively supervise [Petitioner] if [Petitioner] was put on probation. When asked what knowledge he could share with the jury to help them decide [Petitioner]'s punishment, D.H. answered, "[Petitioner] was always a good friend to me and I was always a good friend to him, and I never had any kind of problems, financial or any other way, with [him] or his family."

D.H. denied ever investing any money with [Petitioner]. He said he was not sure about whether [Petitioner] had ever listed him as an investor in his companies, but he added, "He told me one time he was going to do that." D.H. agreed that as a very respected member of his church, being on that list "would give a measure of security and comfort for other members . . . to invest with [Petitioner]." Regarding [Petitioner]'s assertion that he was an investor, when asked if it was possible he had invested $250, D.H. said, "I'm thinking very carefully on that. There is a possibility. I was

sick with my liver at that time, and I could have done that." He added, "I couldn't positively say that, but I could have done that."

During the punishment phase, [Petitioner]'s counsel also called a supervisor with Hood County Adult Probation. She described what was involved when someone was placed on community supervision. The probation supervisor said that if [Petitioner] was placed on the bond caseload for the current case and thereafter proceeded to steal another half a million dollars, that would not be considered a successful bond caseload situation. She said there was no such thing as a residential treatment program for thieves; the only thing community supervision had to offer was a one-day theft intervention class that was used for people who had written hot checks, but community supervision had nothing to address [Petitioner]'s situation. She said [Petitioner] fell into the category of a white collar criminal, which she described as "very, very difficult to supervise."

The last witness [Petitioner]'s counsel called was [Petitioner]'s nephew, but because there was only eleven years' difference in their ages, the nephew saw [Petitioner] more like a brother than an uncle. Except for this case, he had never known [Petitioner] to have been convicted of a felony offense or any other offense.

Although [Petitioner]'s punishment was harsh, his convictions were for offenses that involved preying upon his fellow church members and abusively misusing religion as a means of exploitation. Additionally, the punishment trial itself revealed new developments.

In November 2012, the same month in which [Petitioner] gave a statement to a securities investigator regarding the Patriot Insurance Company and one month before [Petitioner] was indicted, [Petitioner] obtained $116,000 from an octogenarian woman for yet another one of his companies, Lifestyle Protectors and Advisors, LLC. After doing a financial analysis, Sparks determined [Petitioner] had used about $31,000 of this woman's money to pay back four of the investors who had testified earlier. Sparks also determined [Petitioner] was using large portions of the money for his personal expenses, including the attorney's fees [Petitioner] had paid to his previous attorneys.

11

Sparks said that [Petitioner] did not stop with the octogenarian woman. In February 2013, after [Petitioner] was indicted, [Petitioner] received an additional $129,000 from the octogenarian woman's son. Still later, in March or April 2013 [Petitioner] procured $548,000 from another person, J.H., and that money ended up in [Petitioner]'s personal checking account. J.H. denied the authenticity of the signature authorizing the transfer of his $548,000 into [Petitioner]'s personal checking account. J.H. said he strongly suspected [Petitioner] forged his signature.

Sparks said [Petitioner] received $100,000 from another person but did not elaborate. [Petitioner] attempted but failed to entice a former major league baseball player to invest between $150,000 and $200,000 in a pitching device [Petitioner] claimed to have invented. Sparks determined that [Petitioner] also procured approximately $123,600 from a couple and then persuaded them to contribute another $18,000 to help him pay his attorney's fees defending against these criminal accusations.

In short, while being criminally investigated and even after being indicted, [Petitioner] raised over a million dollars. From the evidence, the jury could have found that the criminal investigation and indictment acted only to embolden [Petitioner] and as an accelerant to his proclivities. The Tarrant County District Attorney's office had seized [Petitioner]'s accounts and was holding the money as evidence. [Petitioner]'s own conduct, not the denial of his motion for continuance, adequately explains the jury-assessed punishments.

[Petitioner] stresses that this was his first motion for continuance. This may have been [Petitioner]'s first motion, but it was not the first continuance. In July 2013, the trial court approved the parties' agreement to reset the case from August 18, 2013, to January 27, 2014. In any event, even a first motion for continuance is not a matter of right; whether to grant a first motion is a matter within the trial court's discretion.

[Petitioner] also complains about his previously-retained counsel; however, the choice of which counsel to retain was [Petitioner]'s, and the trial court consistently respected [Petitioner]'s choices. [Petitioner] further complains about the difficulty of

> finding and retaining counsel competent to handle a financial case of this complexity. These difficulties were, however, present from the moment the State first filed the indictment. From December 2012 through trial in January 2014, [Petitioner] was represented by counsel of his own choosing. Additionally, although [Petitioner]'s motion was verified and uncontroverted, the trial court, as the trier of fact, had the discretion to disbelieve even uncontroverted evidence. Ultimately the trial court possessed the discretion to grant or deny [Petitioner]'s motion for continuance: "A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." On this record, we hold the trial court did not abuse its discretion by denying [Petitioner]'s motion for continuance.

(SHR 210-18, doc. 13-26.)

State law appears consistent with federal law on the issue, and Petitioner has not presented clear and convincing evidence to rebut the state court's factual findings. Deferring to those findings, Petitioner fails to establish that the state court's adjudication of the claim is contrary to or an unreasonable application of federal law based on the circumstances. Not every denial of a motion for continuance is a denial of due process. *See Ungar v. Sarafite,* 376 U.S. 575, 589 (1964). The right to counsel of one's choice is not absolute and "cannot be used merely as a manipulative monkey wrench." *Gandy v. State of Alabama,* 569 F.2d 1318, 13-23 (5th Cir. 1978). Nor can a defendant "assume that the right to choose counsel affords 'the right to obtain a delay at his whim and caprice.'" *United States v. Grow,* 394 F.2d 182, 210 (4th Cir.), *cert. denied,* 393 U.S. 840 (1968).

## 2. Ineffective Assistance of Counsel

Under his second ground, Petitioner claims that he received ineffective assistance of trial counsel because counsel failed to properly and thoroughly prepare for trial; failed to file a pretrial motion to recuse the trial judge; failed to secure the services of a handwriting expert; failed to contact and call witnesses; failed to obtain funds from the court to hire a forensic-accounting expert, a securities-law expert, and insurance experts; and failed to object that the jury foreman slept during the trial. (Pet. 6, 14-16, doc. 1.)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and

every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance claims have been reviewed on their merit and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the Strickland standard in light of the state-court record. Richter, 562 U.S. at 100-01 (quoting Williams, 529 U.S. at 410); Bell v. Cone, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)).

In evaluating Petitioner's ineffective-assistance claims, the state courts made no particularized findings. Accordingly, this Court will infer fact findings consistent with the state courts' rejection of the claims and, absent evidence that an incorrect standard was applied, assume the state courts applied the *Strickland* standard in rejecting Petitioner's claims. Having done so, the Court cannot say that the state courts' decision was objectively unreasonable. Petitioner has not demonstrated deficient performance or shown any reasonable probability that the outcome of his trial would have been different but for counsel's representation.

15

"Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner's claim of uncalled witnesses is conclusory, with no evidentiary support. Petitioner did not submit any affidavits or other evidence that uncalled witnesses, including expert witnesses, would have been willing to testify on his behalf and that their testimony would have been beneficial to his defense. *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir. 2002); *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985). Failure to do so is fatal to his claim. *See Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009) (providing this showing is required for claims regarding both uncalled lay and expert witnesses alike); *Sayre v. Anderson,* 238 F.3d 631, 636 (5th Cir. 2001) (complaint of uncalled witnesses failed where petitioner failed to present affidavits from the missing witnesses).

Petitioner's claims that counsel was ineffective by failing to prepare for trial, file a motion to recuse the trial judge, or object to a sleeping juror are also conclusory. There is no indication in the record regarding the nature and extent of counsel's preparation for trial or the motivation behind counsel's actions, and Petitioner fails to show a reasonable probability that the result of the proceeding would have been different but for counsel's acts or omissions. "In the absence of a specific showing

of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced" Petitioner's defense, the claims lack merit. *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992).

A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d).

## VI. Conclusion

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, a certificate of appealability will not be issued. Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of his constitutional claims. Therefore, a certificate of appealability should not issue.

SIGNED February 4, 2019.

                                      TERRY R. MEANS
                                      UNITED STATES DISTRICT JUDGE